## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **JON J. KRIEGEL, et al.,** | CASE NO. 3:23 CV 1620 |
| Plaintiffs, | |
| v. | JUDGE JAMES R. KNEPP II |
| **BRYAN M. FLECK, et al.,** | |
| Defendants. | **MEMORANDUM OPINION AND ORDER** |

### INTRODUCTION

Pending before the Court is Defendants' Motion for Summary Judgment. (Doc. 15). The matter is fully briefed and decisional. (Docs. 15-1, 19, 22). For the reasons discussed below, the Court grants Defendants' Motion in part and denies it in part. Specifically, the Court grants Defendants' Motion as to Plaintiffs' claim for breach of contract but denies it as to all other claims.

### BACKGROUND

This case stems from the sale of real property located at 200 East Chapman Road in Lima, Ohio ("the Property"). (Doc. 1). Defendant Evanston Investments LLC (doing business as "Fleck Manufacturing"), owned by Defendant Bryan Fleck and his wife, began leasing space on the Property in 2016. (Doc. 15-2, at 9). Over the next several years, the lease expanded from approximately twenty percent of the Property's space to approximately eighty percent. *Id.* at 10–12. During that time, ownership of the Property was transferred to Plaintiff Chapman Warehouse LLC, the wholly owned subsidiary of Plaintiff Jon Kriegel. (Doc. 19-6, at 1).

Around late 2020 or early 2021, Kriegel and Fleck began discussing a potential sale of the Property. (Doc. 15-2, at 14). But they contemplated multiple arrangements during the following months. For example, in addition to discussing a long-term lease, Fleck emailed Kriegel on June 30, 2021, proposing attached option and purchase agreements. *See* Doc. 15-7.

On July 20, 2021, Kriegel and Fleck executed two documents: the option agreement attached to the June 30, 2021, email ("Option Agreement"), and a newly drafted document contemplating a pricing scheme for the Property ("Appraisal Agreement"). (Doc. 15-6; Doc. 15-8). The Option Agreement granted Fleck 120 days to purchase the Property pursuant to the terms laid out in its attached "Exhibit A," which was a draft real estate purchase agreement ("Draft REPA"). (Doc. 15-6; Doc. 15-7). The Option Agreement imposed no obligation on Fleck to exercise the option. (Doc. 15-6). The Appraisal Agreement noted the "understanding that the [Draft REPA] presented to Jon Kriegel on June 30, 2021 via email [would] be executed at a later date and that the [Option Agreement], also presented June 30, 2021 via email, [would] be executed in tandem." (Doc. 15-8). It set forth an appraisal scheme for additional compensation to Kriegel in the event the sale occurred. *Id.* Under the appraisal scheme, both parties would secure appraisals; based on those appraisals, additional compensation could be paid to Kriegel. *Id.* Both the Option Agreement and Appraisal Agreement referenced the Draft REPA, which detailed terms of a sale of the Property and specifically referenced the Option Agreement. (Doc. 15-7, at 9). The Draft REPA, as written, attached to the June 30, 2021, email was not executed.

On July 28, 2021, the parties executed a Real Estate Purchase Agreement ("Final REPA"). (Doc. 15-9). While the Final REPA largely mirrored the Draft REPA, there were multiple differences. For example, the Final REPA included a financing contingency, added a "Conditions of Premises" section, changed the closing date from 30 days to 120 days, and contained an

2

integration clause that, contrary to the Draft REPA, specifically excluded all prior agreements regarding the Property. *See id.* The transaction for the sale of the Property closed on October 7, 2021, pursuant to the Final REPA. (Doc. 15-3, at 14).

There was seemingly no direct communication regarding the Appraisal Agreement for months following the Final REPA's execution. (Doc. 19-7, at 36). But on November 29, 2021, after the Property's closing, Kriegel texted Fleck stating they had thirty days left to perform on the Appraisal Agreement. (Doc. 15-10, at 1). Attached to the text message was a photograph of the agreement; Fleck responded that he would "set one up." *Id.* On December 21, 2021, Kriegel again texted Fleck, this time to "confirm [their] agreement to push out the appraisal on [the property] for an additional 90 days." *Id.* at 1–2. Fleck "agreed." *Id.* at 2. Neither party obtained an appraisal during that extended time. (Doc. 19-5, at 17).

On April 7, 2022, 182 days after closing, Kriegel texted Fleck to "discuss the appraisal thing." (Doc. 15-11, at 1). On May 3, 2022, Kriegel suggested an appraiser; Fleck not only opposed the suggestion, but stated the parties were "so far removed from the sale and out of the timeline that [it would] be difficult to come to a correct appraisal" at that point. *Id.* Thereafter, the parties continued discussing the feasibility and purpose of obtaining appraisals. *See id.* at 3–5. Fleck conveyed his belief that the Appraisal Agreement "termed out after 90 days" and the sale was "contractually concluded," but Kriegel maintained it was "still alive" because both parties still "need[ed] to perform." *Id.* at 6. Eventually, Kriegel contracted with an appraiser, Fleck allowed them to access the property, and Fleck obtained his own appraisal. (Doc. 15-2, at 34–36).[1]

---

1. Plaintiffs' opposition alleges, for the first time, that Kriegel contracted with an appraiser in March 2021 and was denied access to the Property. *See* Doc. 19, at 12; Doc. 19-6, at 3. This is supported only by Kriegel's affidavit, and is contradicted by his own deposition testimony and text messages. *See, e.g.*, Doc. 19-5, at 18 (Kriegel Deposition) (stating he "was not successful" in obtaining an appraisal during the 180 days following closing "because of the state of the

The parties dispute the nature of their discussions and understandings regarding the Appraisal Agreement following the Property's closing. *See* Doc. 15-1, at 6 ("Although Fleck conveyed to Kriegel that the Appraisal Agreement was no longer enforceable, he attempted to work with Kriegel over the following months to maintain their professional relationship."); *then see* Doc. 19, at 11 ("For *months* following the transfer, Fleck continuously represented to Kriegel that he understood both parties to be bound by the terms of the Appraisal Agreement."). But text messages show the parties agreed the "formal[]" timeframe for the Appraisal Agreement, if enforceable, ended before either of them obtained an appraisal. (Doc. 19-3, at 2).

After the appraisals were completed, Kriegel sued Fleck for breach of the Appraisal Agreement, unjust enrichment, fraud in the inducement, and detrimental reliance. *See* Doc. 1-2, at 10–13. He asserts each claim supports an award of damages in the amount of $525,000, the difference between the purchase price of the Property and *his* appraisal. *Id.* at 8, 11.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute. Rather, the Court determines only whether the case contains

---

pandemic"); Doc. 19-3, at 1–3 (Kriegel Text Messages) (discussing, in May 2022, about inquiring into an appraiser and stating he had no luck finding someone to do one, and stating in September 2022 that he was "going to order an appraisal"). Because "a party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony[,]" such contentions are not discussed further by the Court in its analysis. *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir. 1998).

sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting a court "need consider only the cited materials").

## DISCUSSION

The Complaint brings four counts: (1) breach of contract, (2) unjust enrichment, (3) fraud in the inducement, and (4) detrimental reliance. (Doc. 1-2, at 10–13). Defendants assert entitlement to summary judgment on all four. (Doc. 15-1). The Court discusses each in turn.

<u>Breach of Contract</u>

Under Ohio law, a successful breach of contract claimant must prove "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Alshaibani v. Litton Loan Serv., LP*, 528 F. App'x 462, 464 (6th Cir. 2013) (quoting *Doner v. Snapp*, 98 Ohio App. 3d 597, 600 (1994)). To survive summary judgment, Plaintiffs "must produce some evidence to support each element of the claim for breach of contract." *Smith v. McDiarmid*, 2022-Ohio-2151, ¶ 30 (Ct. App.) (citation omitted).

Contract interpretation is a question of law. *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000) (citation omitted). To determine a contract's terms, courts typically look to the

written agreement between the parties, but may sometimes consider other evidence to explain or supplement the writing's terms. *See* Ohio Rev. Code § 1302.05. Under Ohio law, the parol evidence rule "bars the use of extrinsic evidence to contradict the terms of a written contract intended to be the final and complete expression of the contracting parties' agreement." *Winston Sav. & Loan Co. v. Eastfork Trace, Inc.*, 2002-Ohio-2600, ¶ 9 (Ct. App.) (citation omitted). So while courts may look at other evidence to explain or supplement the writing's terms—such as the parties' course of performance and dealing, trade use, and consistent additional terms—they may only do so if the writing was not intended to be a complete and exclusive statement of the agreement. *See id.*; Ohio Rev. Code § 1302.05. "Absent ambiguity in the language of the contract, the parties' intent must be determined from the plain language of the document." *Keal v. Day*, 164 Ohio App. 3d 21, 24 (2005) (citing *Hybud Equip. Co. v. Sphere Drake*, 64 Ohio St. 3d 657, 665 (1992)).

Defendants argue the Appraisal Agreement is not an enforceable contract for two reasons: (1) it lacks essential terms for independent enforceability, and (2) it was superseded by the Final REPA and cannot be used to modify its terms. (Doc. 15-1, at 8). Plaintiffs contend the Appraisal Agreement's terms are enforceable, that it was not superseded, and, even if it was, the parties' post-closing conduct demonstrates a valid modification of its terms subsequent to the Final REPA. (Doc. 19, at 14–25).

*Price Term*

Defendants first argue the Appraisal Agreement cannot be a valid or enforceable contract because it lacks an essential term under Ohio law—the price term. (Doc. 15-1, at 9). Plaintiffs contend the necessary variables for a valid price term are either provided by the Appraisal Agreement's language or easily ascertainable thereby. (Doc. 19). As discussed below, the parties'

6

cited evidence suggests a genuine dispute regarding the Appraisal Agreement's initial validity, making the issue inappropriate for summary judgment.

Under Ohio law, price is an essential term in a contract for sale—it must state the price in a "definite and certain" way to be enforceable. *Martin v. Jones*, 41 N.E.3d 123, 136 (Ohio Ct. App. 2015); *see also Alligood v. Procter & Gamble, Co.*, 72 Ohio App. 3d 309, 311 (1991). A price term is inadequate, rending a contract unenforceable, if it is "so vague and indefinite that one party will charge what he will while the other party must guess at his obligation." *Preston v. First Bank of Marietta*, 16 Ohio App. 3d 4, 6 (1983). But the price need not be explicitly stated so long as it is easily ascertainable by reference to some extrinsic standard. *Ameritech Publ., Inc. v. Snyder Tire Wintersville, Inc.*, 2010-Ohio-4868, ¶ 32 (Ct. App.) (citing *id.*). A formula is generally sufficient to establish a "definite and certain" price term so long as it makes the price easily ascertainable by reference to an extrinsic standard, such as "a contract to buy stock at market price." *Ameritech*, 2010-Ohio-4868 at ¶ 32 (quoting *Oglebay Norton Co. v. Armco, Inc.*, 52 Ohio St. 3d 232, 236 (1990)).

Ohio courts have held price terms sufficient where future appraisals were to be relied upon for their determination. *See Ohio Fish Indus., LLC v. Martin*, 2005-Ohio-853 (Ct. App.) (enforcing a settlement agreement where the purchase price for real estate was to be determined by an appraisal); *Metal Craft Docks Acquisition v. Richlak*, 2003-Ohio-191, ¶¶ 9, 31 (Ct. App.) (holding enforceable an agreement providing the purchase price to be based on future appraisals obtained by each party, with any discrepancy to be settled by arbitration). And Ohio case law establishes that where there are conflicting statements regarding what an option contract's price term meant to convey, summary judgment is inappropriate. *Bailey v. Mills*, 2001 WL 166812, at *2 (Ohio Ct. App.) (reversing trial court's grant of summary judgment where an option contract stated the price

was "to be determined," but external writings showed a listing price per acre; the court held

nonexistence of a contract due to a definitive price term not having been established).

The Appraisal Agreement contained the date, a description of the Property, signatures of

Fleck, Kriegel, and one witness, and the following terms:

- Within 90 days of closing the sale of the property an independent appraisal will be ordered by both parties and the average of both appraisals will be used. If two appraisals does not result in an agreeable price, a third can be ordered and added to the average

- Jon Kriegel will be compensated based on the difference between the purchase price and appraised price anything in excess of $3,500,000

- Terms and rate of compensation will be negotiated between Bryan Fleck and Jon Kriegel after the signing on this agreement. Can include equity stock options, termed monthly payments, or other mutually agreed upon compensation

This agreement is made with the understanding that the purchase contract presented to Jon Kriegel on June 30, 2021 via email will be executed at a later date and that the option to purchase contract, also presented June 30, 2021 via email, will be executed in tandem with this agreement.

(Doc. 15-8). It required the parties to obtain independent appraisals, which were to be averaged

and used to determine the amount potentially compensated to Kriegel. *Id.* But Defendants take

issue with the phrases "based on" and "[t]erms and rate of compensation[,]" and argue their

ambiguity leads to the Appraisal Agreement's invalidity. (Doc. 15-1, at 9–10).

The Court agrees the Appraisal Agreement's use of "based on" could lead reasonable

minds to different understandings; the parties' arguments demonstrate such. For example, Fleck's

testimony shows an understanding that the average of the appraisals was to be the final number,

and anything over 3.5 million would be paid to him. (Doc. 19-5, at 20–21, 24). Kriegel's testimony,

however, shows an understanding that the averaged appraisals were just a starting point for

negotiations. (Doc. 19-7, at 29). And the affidavit of Ryan Niese claims both parties understood

the agreement as adopting Fleck's interpretation. (Doc. 19-9). But while the Court determines whether an ambiguity exists in a contract, "determining the intent and meaning of the parties becomes a question of fact for the jury." *Becker v. Rapidigm, Inc.*, 2005 WL 2397672, at *6 (S.D. Ohio) (citing *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio*, 15 Ohio St. 3d 321, 321–24 (1984)).

As such, the issue of the Appraisal Agreement's validity is inappropriate for summary judgment on this argument.

*Superseded and Excluded*

Defendants next argue, regardless of initial validity, the Appraisal Agreement is unenforceable due to the Final REPA's execution. They assert the parol evidence rule precludes consideration of the Appraisal Agreement because the Final REPA is the full and final contract between the parties regarding the Property. (Doc. 15-1, at 10–11). Plaintiffs' response is two-fold: first, they contend the Appraisal Agreement, Option Agreement, and Final REPA were all one transaction; second, they argue the parol evidence rule is independently inapplicable here. (Doc. 19, at 20–22). As discussed below, the Court finds the Final REPA superseded the Appraisal Agreement and the parol evidence rule bars its consideration to modify or supplement the Final REPA's terms.

**Superseded**

Under Ohio law, a prior contract is unenforceable where a subsequent one unambiguously shows the parties' intent to supersede its terms. *Schempp v. GC Acquisition, LCC*, 161 F. Supp. 3d 584, 591 (N.D. Ohio 2014) (citing *TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 70 Ohio St. 3d 271 (1994)). Executing an option contract does not preclude parties from subsequently contracting for the same subject matter with terms more favorable to the option holder, thus superseding the prior

agreement. *Breed, Elliott & Harrison v. City of Lima*, 12 Ohio App. 485, 489–90 (1920) (holding a purchase contract superseded the prior option contract where the purchase contract did not adopt terms of the option and provided for a different time and manner for delivery of bonds and notes); *Reading Concrete Prods., Corp. v. Harry Wellnitz Co.*, 1989 WL 99441, at *2 (Ohio Ct. App.) (holding option not exercised where option agreement, which specified terms of payment could not be varied, proposed a purchase agreement that "contained terms at variance with the option agreement" because the proposed purchase agreement acted as counteroffer); *715 Spencer Corp. v. City Env't Servs., Inc.*, 80 F. Supp. 2d 755, 760–61 (N.D. Ohio 1999) (stating an optionee would no longer need the protections of an option if they were "able to negotiate a purchase agreement with terms that were more favorable to it than those terms provided in the option contract"). "Whenever an executory contract is executed by a new contract in writing, the latter is presumed to express the final agreement of the parties, and conditions in the former agreement not included in the last, nor reserved or continued by its terms, are, in the absence of fraud, or mistake, deemed waived." *Breed*, 12 Ohio App. at 490 (quoting *Bunday v. Huntington*, 224 F. 847, 853 (8th Cir. 1915)).

Plaintiffs first argue the Appraisal Agreement was not superseded because "an option to purchase agreement is not voided if the optionee requests changes to the purchase agreement contemplated by the option." (Doc. 19, at 23). They cite *Metal Craft Docks Acquisition v. Richlak*, in which an Ohio court held an optionee's notice to exercise an option valid where the notice also addressed matters required for the transfer of property. 2003-Ohio-191. Contrary to Plaintiffs' assertion, the *Metal Craft* court ruled "the 'additional terms' were merely suggestions of how the parties could take care of certain legal issues that were inherent with the real estate transaction[,]" not that changes to an option agreement are enforceable if requested by the optionee. *Id.* ¶ 18. And

10

the Final REPA was not nominally changed in a way contemplated in the Option Agreement; the reference to the Option Agreement was specifically taken out, changing the terms of the agreement. The Court does not need to look further than the Final REPA's explicit exclusion of the Option and Appraisal Agreement. The Final REPA is a separate and independent contract and therefore supersedes any contrary or additional terms contained in the Option or Appraisal Agreements.

Plaintiffs next contend the Final REPA was not fully integrated, regardless of the integration clause, because the Appraisal Agreement, Option Agreement, and Final REPA were executed as one transaction. (Doc. 19, at 21–22). Courts may construe documents together to interpret a contract if they are part of the same transaction, and thus such documents would not supersede each other. *Seyfried v. O'Brien*, 2017-Ohio-286, ¶ 24 (Ct. App.). Documents that are executed contemporaneously are generally considered to concern the same transaction. *See id.*

Plaintiffs' "same transaction" contention heavily relies on *Seyfried*, which considered the effect of a purchase agreement modification on a previously executed transaction. *Id.* The plaintiff in *Seyfried* executed a purchase agreement and arbitration agreement, within moments of each other, for the purchase of a vehicle. The purchase agreement allowed him to cancel the transaction if he did not secure financing. Though he did not secure financing, rather than cancelling the transaction, the dealership worked with the plaintiff and changed the price term of the (already commenced) sale and executed a modified purchase agreement reflecting the different price. *Id.* ¶¶ 4–7. While the parties did not re-execute an arbitration agreement with the modification, the *Seyfried* court clarified that a mere modification to an already existing transaction relates back to the initial transaction. In effect, because the transaction for the sale of the car had already occurred, this price term change was merely a modification to those executed terms and the arbitration agreement remained in effect. *Id.* ¶¶ 24, 27.

Here, while the Option Agreement and Appraisal Agreement may have been "contemporaneously" executed, a contract for the sale of the Property was not. The parties never executed the Draft REPA as written and referenced by the Option and Appraisal Agreements. The transaction for the sale of the Property did not occur until the parties executed the Final REPA, which took place over a week after the Option and Appraisal Agreements were signed.[2] (Docs. 15-6, 15-8, 15-9).

The Final REPA's integration clause reads: "This Agreement constitutes the entire agreement between the parties. There are no representations, oral or written, which have not been incorporated herein." (Doc. 15-9, at 7). Under Ohio law, similar language is regularly given its full effect. *See, e.g.*, *Fontbank, Inc. v. CompuServe, Inc.*, 742 N.E.2d 674, 678–79 (Ohio Ct. App. 2000) (holding a nearly identical integration clause enforceable, barring consideration of pre-contract communications between the parties that may have demonstrated the existence of an otherwise enforceable oral agreement on the same subject matter).

As stated, the existence of an option contract does not preclude a subsequent purchase agreement from superseding its terms. The parties are both sophisticated; the Final REPA includes no language implicating or incorporating other documents, unlike the Draft REPA. *See, e.g.*, Doc. 19-5, at 4 (Kriegel Dep.) (stating he is experienced in commercial real estate).

Thus, the Court finds the Final REPA superseded the Option Agreement and Appraisal Agreement, rendering the terms of the Appraisal Agreement unenforceable.

---

2. Plaintiffs argue the Appraisal and Option Agreements required Kriegel to execute the Final REPA. This is incorrect. While Kriegel chose to execute the Final REPA which, contrary to the Draft REPA referenced in the Option Agreement, excluded all prior agreements, he was not required to do so by either the Appraisal or Option Agreements' terms.

**Parol Evidence**

Under Ohio law, the parol evidence rule excludes extrinsic evidence—being evidence of prior or contemporaneous promises, understandings, or representations—that vary from or contradict the terms of a final written contract. *Divine Tower Intern. Corp. v. Kegler, Brown, Hill & Ritter Co.*, 2007 WL 2572258, *16 (S.D. Ohio) (citing *Charles A. Burton, Inc. v. Durkee*, 158 Ohio St. 313 (1952)). The effect of extrinsic evidence, such as the Option or Appraisal Agreements, on final integrated contracts, such as the Final REPA, will not be considered unless some ambiguity exists in the language of the contract. *See Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 176 Ohio St. 3d 505, 509 (2024). Ambiguity exists in a contract only when its terms cannot be given a "definite legal meaning" and "are susceptible to more than one reasonable interpretation." *Id.* (quoting *Sunoco, Inc. v. Toledo Edison Co.*, 129 Ohio St. 3d 397, 404 (2011)).

Plaintiffs present multiple arguments to reason the parol evidence rule is inapplicable to the Appraisal Agreement. First, Plaintiffs contend the Final REPA is the true "extrinsic evidence" here. Second, they repeat their "same transaction" argument to assert the Final REPA is not fully integrated. And third, they claim the Appraisal Agreement does not conflict with the Final REPA so as to be excluded by the parol evidence rule.

In their first argument, Plaintiffs suggest that the Appraisal Agreement is not parol evidence because it is the agreement at issue. (Doc. 19, at 20). This is a mischaracterization of the law. The parol evidence rule states: "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of *prior or contemporaneous* oral agreements, or *prior* written agreements." *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 27 (2000) (emphasis added) (quoting 11 Williston on Contracts § 33:4 (4th ed.)). It defines the limits of a contract, and only seeks to exclude evidence of *prior*

13

agreements, not subsequent, to interpret final contracts. *MidFirst Bank v. Biller*, 2010-Ohio-6067, ¶ 21 (Ct. App.). Here, the Appraisal Agreement was executed *before* the Final REPA and concerns the same subject matter. As the subsequent agreement, the Final REPA is not extrinsic evidence regardless of which agreement formed the basis for Plaintiffs' breach of contract claim.

Plaintiffs next argue the parol evidence rule could not apply to exclude the Appraisal Agreement because the parties did not intend the Final REPA to be fully integrated by the integration clause, as the Appraisal Agreement, Option Agreement, and Final REPA were all one transaction. (Doc. 19, at 20–25). In furtherance of this argument, Plaintiffs point to the Draft REPA's failure to integrate the Appraisal Agreement—they contend this, coupled with the language of the Appraisal Agreement, shows the parties "clearly intended" to include the Appraisal Agreement in both the Draft and Final REPAs because, otherwise, the Appraisal Agreement would be afforded no meaning. *Id.* at 21–22. Plaintiffs appear to use this argument as an attempt to smuggle additional contract terms into the Final REPA under the guise of contract interpretation. But interpretation of the Final REPA is not truly at issue here. Ohio courts have held that looking to extrinsic evidence, including prior written agreements, when the integration clause specifies the instant contract constitutes the "entire" agreement would "accord the clause no meaning." *Kelley v. Ferraro*, 936 N.E.2d 986, 993 (Ohio Ct. App. 2010). The same is true here, as Plaintiffs offer no argument for why the text of the integration clause itself contains an ambiguity fit for jury resolution. *See Tera*, 248 N.E.3d at 201. Rather, all evidence offered to address the effect of the integration clause on the appraisal agreement originates from outside the four corners of the Final REPA. But in order for this Court to consider such extra-textual evidence, the text of the Final REPA's integration clause must itself be ambiguous. In short, extrinsic evidence can only resolve an established ambiguity, it cannot create one. *Cf. First Nat'l Bank of Pa. v. Nader*, 89 N.E.3d 274,

14

284 (Ohio Ct. App. 2017) ("Parol evidence is used only to interpret the terms, and not to contradict the terms.").

Finally, Plaintiffs argue that regardless of whether the Appraisal Agreement is extrinsic evidence, it is not excluded by the parol evidence rule because it does not contradict the Final REPA's terms. But the language of the Final REPA is clear. Defendants agreed to "pay [Plaintiffs] for the above premises . . . the total sum of Three Million Four Hundred Thousand and 00/100 Dollars ($3,400,000.00)" to purchase the Property. *See* Doc. 19-6. Nowhere does the Final REPA suggest that the parties contemplated a later appraisal or additional payment terms to be continued after closing. The document is fully integrated, both in substance and explicit terms, leaving no room to question whether any outside documents or agreements made before or during execution can add additional terms. *See* Doc. 15-9, at 7 ("This Agreement constitutes *the entire agreement* between the parties. There are *no representations, oral or written, which have not been included herein*.") (emphasis added).

Thus, the Appraisal Agreement is impermissible parol evidence and may not be considered to supplement the payment terms in the Final REPA.

*Post-Purchase Agreement Conduct Recognizing Appraisal Agreement*

Plaintiffs' final contention as to the breach of contract claim is that, even if superseded, the Appraisal Agreement would be valid as "a subsequent agreement to reaffirm a prior agreement." (Doc. 19, at 24–25). Plaintiffs argue the exchanges between Kriegel and Fleck, such as extending the appraisal deadline and showing intent to have an appraisal done, constitute a modification after the Final REPA's execution, making the Appraisal Agreement enforceable.

But all conduct Plaintiffs allege to have "revived" the Appraisal Agreement occurred after the closing on the Property. *See* Doc. 19, at 24. And while "a subsequent agreement to reaffirm

15

[an] initial agreement is not barred by the parol evidence rule" (*id.* at 25), such an agreement is only valid where a preexisting legal obligation exists or new consideration is given. *See Expeditors Intern. of Wash., Inc. v. Crowley Am. Transp., Inc.*, 117 F. Supp. 2d 663, 669 (S.D. Ohio 2000) ("Under Ohio law, consideration sufficient to support an enforceable modification must be 'new and distinct' from that supporting the original contract. Simply agreeing to do what one is already under an obligation to do does not constitute new or separate legal consideration.") (citation modified). Any obligations either party could owe under the Appraisal Agreement were contingent on the execution of a purchase agreement that did not vitiate its terms. That did not happen; the parties contracted to different terms and obligations under the Final REPA and fulfilled all duties thereunder by the Property's closing. Any promise by Fleck after the Property's closing would have been gratuitous unless new consideration was given. *Id.*; see also *Widok v. Est. of Wolf*, 2020-Ohio-5178, ¶ 64 (Ct. App.) ("Gratuitous promises are not enforceable as contracts, because there is no consideration. A written gratuitous promise, even if it evidences an intent by the promisor to be bound, is not a contract. Likewise, conditional gratuitous promises, which require the promisee to do something before the promised act or omission will take place, are not enforceable as contracts."). And Plaintiffs do not allege any such consideration was exchanged.

As a result, even if the Appraisal Agreement's initial terms may have allowed for an enforceable contract, the Final REPA superseded the Appraisal Agreement and the parties' conduct could not act to "revive" its supposed obligations. Defendants are entitled to summary judgment on Plaintiffs' breach of contract claim.

Unjust Enrichment

Unjust enrichment is an equitable doctrine based on principles of quasi-contract. *Homan, Inc. v. A1 AG Serv., L.L.C.*, 175 Ohio App. 3d 51 (2008). Under Ohio law, there generally cannot

16

be "an express agreement and an implied contract for the same thing existing at the same time." *See DuBrul v. Citrosuco N. Am., Inc.*, 892 F. Supp. 2d 892, 914 (S.D. Ohio 2012) (quoting *Harwood v. Avaya Corp.*, 2007 WL 1574116, at *10 (S.D. Ohio)); *RAM Constr. Servs. v. Key Constr., Inc.*, 624 F. Supp. 3d 884, 896–97 (N.D. Ohio 2022) (holding quasi-contract theories of recovery unavailable where parties have a written agreement that covers the claims at issue). But a plaintiff may plead unjust enrichment in the alternative where they allege fraud on the part of the defendants. *See, e.g.*, *Firestone Lab. & Manuf. LLC v. Bristow*, 745 F. Supp. 3d 552, 568 (N.D. Ohio 2024) (holding, while claims may be plead in the alternative, an enforceable contract is legally inconsistent with a quasi-contract).

Defendants assert this claim is barred because there is an express agreement covering the subject matter in question—the Final REPA. (Doc. 15-1, at 11). Plaintiffs contend this claim may proceed because: (1) the Appraisal Agreement's existence is disputed and they may plead unjust enrichment in the alternative; and (2) they alleged facts demonstrating all relevant documents were executed due to Fleck's fraudulent misrepresentations. (Doc. 19, at 26).[3]

Plaintiffs rely on Federal Rule of Civil Procedure 8(d) to state they may set out two alternative theories of a claim regardless of inconsistency. *Id.* at 20. They also cite to *Hummel*, in which the Ohio Supreme Court permitted the plaintiff to maintain a cause of action for unjust enrichment based on an oral contract that was unenforceable by operation of the statute of frauds.

---

3. Plaintiffs also appear to make an assertion about the fact that Evanston Holdings, rather than Fleck, is the party to whom the property now belongs and was not party to the Appraisal Agreement. (Doc. 19, at 27). Because they cite no supporting law nor expand upon any legal argument, it is not explored by the Court. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (alteration in original) (internal citation omitted)).

(Doc. 19, at 26); *Hummel v. Hummel*, 133 Ohio St. 520 (1938). But *Hummel* is inapposite to this case. And Plaintiffs fail to assert how the Final REPA's existence does not extinguish this argument.

Plaintiffs next argue their equitable claim is barred "only if [they] cannot show bad faith, fraud, or some other illegality." (Doc. 19, at 24) (citing *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 46 Ohio St. 3d 51, 55 (1989); *Weiper v. W.A. Hill & Assoc.*, 104 Ohio App. 3d 250, 262 (1995)). They cite *Cristino v. Bureau of Workers' Compensation* to support this contention, and suggest they have submitted allegations and facts sufficient to demonstrate all documents were executed due to Fleck's fraudulent misrepresentations. (Doc. 19, at 26). The *Cristino* court allowed unjust enrichment to be plead in the alternative where the plaintiff claimed to have been misled into accepting a lump sum payment from the Bureau of Workers' Compensation. *Cristino v. Bur. of Workers' Comp.*, 2012-Ohio-4420 (Ct. App.). While Defendants contend there is no evidence to support an assertion of fraudulent intent or misrepresentation, Plaintiffs presented enough to create an issue of fact fit for jury resolution. *See, e.g.*, Doc. 19-6, at 28 (email from Fleck to Kriegel with the Final REPA, stating the changes "line up with what [Kriegel was] asking for last week" and mentioning an appraiser). As discussed further below, Kriegel's email, coupled with the produced post-closing communications and representations, are sufficient to allow a reasonable jury to find fraudulent intent.

Because the record suggests a question of fact on this claim, it survives summary judgment.

<u>Fraud in the Inducement</u>

To establish a claim for fraud in the inducement, a plaintiff must establish: (1) a representation or, where there is a duty to disclose, concealment of fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard

18

and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866 (6th Cir. 2007) (quoting *Lepera v. Fuson*, 613 N.E.2d 1060, 1063 (Ohio 1992)).

Defendants claim Plaintiffs' fraud in the inducement claim fails for two reasons: first, that Plaintiffs do not state an independent cause of action; and second, that Plaintiffs cannot demonstrate the required elements to state a claim. As discussed below, the Court finds Plaintiffs' fraud in the inducement claim survives summary judgment.

Defendants first assert Plaintiffs' fraud in the inducement claim does not state an independent cause of action because it is based only on a breach of the appraisal agreement and not a separate independent duty, and that Plaintiffs failed to allege distinct damages. (Doc. 15-1, at 12–14; Doc. 19-5, at 22). Defendants further claim Plaintiffs cannot prove the necessary elements of material misrepresentation or reasonable reliance because they fail to show Defendants made a material misrepresentations *prior to* the execution of the Appraisal Agreement, and present no proof regarding reasonable reliance. (Doc. 15-1, at 12, 15).

But Plaintiffs highlight "well established Ohio law that, where a defendant makes a promise . . . without any intention of performing it . . . this constitutes a misrepresentation of the promisor's existing state of mind and present intent, which can support a fraud claim." Doc. 19, at 28; *Williams v. Edwards*, 129 Ohio App. 3d 116 (1998). They contend their evidence and allegations demonstrate Fleck made promises to induce Kriegel to execute the Option Agreement and Final REPA. (Doc. 19, at 28). Plaintiffs argue, "by his own admission, Fleck did not intend to make the required payment or otherwise perform on the promises contained in the [Appraisal Agreement] when the parties executed the [Appraisal Agreement], [Option Agreement], or [Final

19

REPA]." *Id.* While Fleck testified he intended to comply with the Appraisal Agreement at the time it was signed (Doc. 19-7, at 32), Plaintiffs submitted Kriegel's affidavit, an email from Fleck stating the Final REPA's changes "line up with what [Kriegel was] asking for" the prior week and "should cover . . . the appraiser", and text messages after the Property's closing that could suggest Fleck strategically and intentionally acted to avoid being bound. *See, e.g.*, Doc. 19-1; Doc.19-2; Doc. 19-3; Doc. 19-6, at 2–3, 28. This evidence creates an issue for a jury. *See id.*; *see also Carey v. FedEx Ground Package Sys.*, 321 F. Supp. 2d 902, 922–24 (S.D. Ohio 2004) (allowing a claim for fraud in the inducement to proceed where plaintiff alleged defendant never intended to keep a promise but offered no direct evidence of the defendant's subjective intent). A reasonable jury could find that, given Kriegel's testimony, Kriegel and Niese's affidavits, and the communications between the parties before and after the close of sale, Fleck engaged in a pattern of strategic misrepresentations and delay to induce the Final REPA's signing. *See id.* The circumstantial evidence is sufficient to support a finding that, at the time of making the promises included in the appraisal agreement, Fleck did not intend to keep those promises. *See Doyle v. Fairfield Mach. Co.*, 697 N.E.2d 667, 677 (Ohio Ct. App. 1997) (holding that "[i]n proving knowing falsity and intent to mislead or deceive, a plaintiff is not necessarily required to present direct evidence, such as a confession by the tortfeasor that he knowingly deceived plaintiff. Rather, a plaintiff may present circumstantial evidence to show the required knowledge or intent.").

Defendants' final argument is that while "the parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement[,]" Ohio courts recognize "the parol evidence rule may not be avoided by a fraudulent inducement claim which alleges that the inducement to sign the writing was a promise, the terms of which are directly contradicted by the signed writing." *Galmish*, 90 Ohio St. 3d at 28–29 (citation modified).

20

But the "false promises" Plaintiffs allege to have reasonably relied upon, the terms of the Appraisal Agreement and Fleck's promise to abide by them, are not directly contradicted by the payment terms of the Final REPA. Doc. 19, at 29; *see also Shannon v. Fischer*, 2020-Ohio-5567 ¶ 23 (Ct. App.) ("The requirement of justifiable reliance tests the credibility of the claim that fraud induced a party to act and it is generally a question of fact.") (citing *March v. Statman*, 2016-Ohio-2846, ¶ 22 (Ct. App.)). And this analysis is regardless of the presence of an integration clause. *See Galmish*, 90 Ohio St. 3d at 28–29 (allowing parol evidence of fraud in the inducement regardless of the integration clause).

A reasonable jury could find that, given the conflicting evidence of the parties' understandings, Fleck's email stating their prior conversation would be honored by the Final REPA and that it accounted for an appraisal, and Fleck's conduct after the close of sale, Fleck used fraudulent promises to induce Kriegel into signing the Final REPA. *See Carey*, 321 F. Supp. 2d at 924–25. Kriegel offered multiple pieces of circumstantial evidence that, construed in a light favorable to him, are sufficient for a reasonable jury to find that Fleck never intended to keep his appraisal-related promises. Nothing more is required of him, and for that reason summary judgment is inappropriate on this issue.

Detrimental Reliance / Promissory Estoppel

Defendants contend Plaintiffs' claim for "Detrimental Reliance," as stated in their Complaint, is not recognized under Ohio law and thus no cause of action exists. *See 715 Spencer Corp*, 80 F. Supp. 2d at 763 (stating detrimental reliance is not a separate cause of action under Ohio law). But the label in a complaint is not dispositive, and a cause of action labeled as "detrimental reliance" may be considered as a proper claim for promissory estoppel. *Extreme Mach. & Fabricating, Inc. v. Avery Dennison Corp.*, 2016-Ohio-1058, ¶ 36 (Ct. App.) (finding a

promissory estoppel claim properly pled where the complaint labeled the cause of action as "detrimental reliance").

A claim of promissory estoppel requires: "(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) the reliance caused an injury to the party claiming estoppel." *Id.* (*citing Trehar v. Brightway Ctr.*, 2015-Ohio-4144, ¶ 17 (Ct. App.)). The Complaint alleges all required elements of claim for promissory estoppel. *See* Doc. 1-2, at 12–13.

Because the only argument in Defendants' Motion is that the cause of action is not recognized under Ohio law, summary judgment is inappropriate on this basis.[4]

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants' Motion for Summary Judgment (Doc. 15) be, and the same hereby is, GRANTED in part as to breach of contract, and is DENIED in part as to all other claims.

        s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: September 24, 2025

---

4. In reply to Plaintiffs' opposition, Defendants present two additional arguments as to why a claim for promissory estoppel fails. (Doc. 22, at 8–9). But "[a] movant cannot raise new issues for the first time in a reply brief because consideration of such issues 'deprives the nonmoving party of its opportunity to address the new arguments.'" *Clark v. Shop24 Glob., LLC*, 77 F. Supp. 3d 660, 677 n.6 (S.D. Ohio 2015) (quoting *Cooper v. Shelby Cnty.*, 2010 WL 3211677, at *3 n.14 (W.D. Tenn. 2010)). Thus, the Court only considers the arguments in Defendants' Motion (Doc. 15-1).